IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

SUSAN E. McAMIS                          )
                                         )
v.                                       )        No. 2:08-0095
                                         )        Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION           )


To:     The Honorable Thomas A. Wiseman, Jr., Senior Judge


## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration"), through its Commissioner, denying plaintiff's application for

supplemental security income ("SSI") benefits, as provided under Title XVI of the Social

Security Act ("the Act").  The case is currently pending on plaintiff's motion for judgment

(Docket Entry No. 32), to which defendant has responded with its own motion for judgment

(Docket Entry No. 40).  Upon consideration of these papers and the transcript of the

administrative record (Docket Entry No. 14),[1] and for the reasons given below, the

undersigned recommends that plaintiff's motion for judgment be GRANTED, that

defendant's motion for judgment be DENIED, and that the decision of the SSA be

REVERSED and the cause REMANDED for further administrative proceedings consistent

with this report.

-----

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

1

# I. Introduction

Plaintiff filed the current SSI application on November 26, 2003, alleging disability as of February 1, 1993, due to mental problems. (Tr. 82-87, 128) Plaintiff's application was denied at both the initial and reconsideration stages of review by the state Disability Determination Section ("DDS"). (Tr. 67-70, 74-76) Plaintiff thereafter requested and received a *de novo* hearing of her case by an Administrative Law Judge ("ALJ"). On August 11, 2005, plaintiff appeared with counsel before the ALJ and gave testimony. (Tr. 639-56) The ALJ adjourned the hearing after notifying plaintiff of his intent to secure an additional expert opinion on her mental conditions. (Tr. 655-56) The hearing was reconvened following this additional factfinding, on July 25, 2006. (Tr. 657-74) Plaintiff again appeared with counsel and gave testimony. Testimony was also received from a witness for plaintiff, Mr. Paul Haggard, and from an impartial vocational expert. At the conclusion of this second hearing, the ALJ took the case under advisement, until September 27, 2006, when he issued a written decision denying plaintiff's claim to benefits. (Tr. 19-26) The decision contains the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since February 1, 1993, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).

2. The claimant has the following severe impairments: borderline intellectual functioning, anti-social personality disorder, panic disorder, and depression (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform simple, repetitive

Case 2:08-cv-00095   Document 44   Filed 02/24/10   Page 2 of 36 PageID #: 170

non-detailed tasks where co-worker and public contact is casual and infrequent, where supervision is direct and non-confrontational, and where changes in the workplace are infrequent and gradually introduced.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on July 8, 1976 and was 27 years old on the date the application was filed, which is defined as a younger individual age 18-44 (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10.     The claimant has not been under a "disability," as defined in the Social Security Act, since November 26, 2003 (20 CFR 416.920(g)), the date the application was filed.

(Tr. 21, 23-26)

On August 12, 2008, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 5-9), thereby rendering that decision the final decision of the Administration.  This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c).  If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive.  Id.

3

## II. Review of the Record

The following factual summary is taken from defendant's brief (Docket Entry No. 43 at 3-11), with some modification by the undersigned. Further explanation of the evidence related to plaintiff's intellectual impairment is contained in the conclusions that follow this section.

### A. Hearing Testimony and Other Evidence

Plaintiff was born in July 1976, making her 30 years old at the time of the ALJ's decision (Tr. 25). Plaintiff completed the 11th grade, attended special education classes (Tr. 101, 128, 131) and did not have any past relevant work (Tr. 96, 107-10, 667). In describing her complaints, plaintiff claimed that she was a slow learner and had mood swings (Tr. 21). In terms of activities of daily living, plaintiff cared for her personal needs, prepared simple, cold meals for herself, did some driving, shopped with her mother or husband, swept, mopped, did laundry, watched television, listened to the radio, visited with family and a friend, and played with her 4 children when she had visitation (Tr. 116-26, 149-50). Plaintiff lived either with her husband, or alone while he was incarcerated (Tr. 149). An impartial vocational expert (VE) testified at the supplemental hearing on July 25, 2006 (Tr. 667-674). The VE was asked to consider whether an individual of plaintiff's age, education, limited prior work, with some psychological and emotional non-exertional limitations could perform work (Tr. 667-68). In response, the VE noted that such an individual could perform jobs such as: hand packager, machine cleaner and linen-room attendant (Tr. 26, 668).

## B. Medical Evidence

Plaintiff alleged she was disabled as of February 1, 1993, due to mental problems and being a slow learner (Tr. 95). Education records indicate that plaintiff received special education ("special ed.") services in regular school classes (Tr. 499, 503). Special ed. reports prepared by the school psychologist, in March 1986 (age 9) and July 1989 (age 12) found plaintiff eligible for special ed. because she met the criteria of "Other" (Tr. 498-502, 504-07). On administration of the Wechsler Intelligence Scale for Children-Revised (WISC-R), plaintiff had full scale IQ scores of 55 +/- 3 and 54 +/-3. Id. Plaintiff's adaptive behavior scores were 89 and 95 respectively which indicated that she was not adaptively retarded. Id. At age 16, she again met the criteria for special ed. and was identified as "Other" functionally delayed (Tr. 198, 495). Again, testing indicated that plaintiff had average to low-average ability in reading and written language, deficient ability in math and adequate adaptive functioning in all other areas, with no adaptive retardation (Tr. 200-01, 496-97, 504-07). Plaintiff elected to not return to school for 12th grade due to becoming pregnant (Tr. 202-04).

From 1980-2003, plaintiff was treated by a family physician, Dr. Joseph Caten, for general ailments including: colds, fevers, rashes, bee stings, stomach and shoulder pain (Tr. 212-33). In 2003, at plaintiff's request for disability papers, Dr. Caten referred her for mental health services and opined that plaintiff had: depression; mental problems; "poor" understanding, memory, concentration, and adaptation; "ok" persistence; and "edgy" social interaction (Tr. 213-14). Dr. Caten opined on August 12, 2003, that plaintiff was not capable

of managing her own funds, and noted that she "tends to spend money" (Tr. 211). In June 2004, Dr. Caten opined that plaintiff was "unable to work," that she "should have psychiatric care" due to depression, and that she was "suspected to be a very slow person" (Tr. 248).

At the request of the DDS, in October 2001, as part of a prior claim, plaintiff was referred to William O'Brien, Psy.D. for psychological evaluation (Tr. 675-80).[2] Dr. O'Brien noted that plaintiff was a poor historian, she frequently responded that she "can't remember" or she "forgot" and the information she did provide was questionable (Tr. 675). On exam, plaintiff was alert but not oriented, her mood was mildly depressed with her affect congruent to her mood, her thought processes appeared organized and goal directed and her judgment and insight were deemed poor-fair. Id. Dr. O'Brien thought it most likely that she had lost custody of her children due to her limited intellectual functioning (Tr. 676). Plaintiff reported depressive type symptoms, low energy, crying spells, sleep disturbances and poor concentration and activities of daily living such as straightening up the home, preparing simple meals, and dressing independently (Tr. 677). Dr. O'Brien reported that plaintiff obtained a full scale IQ score of 49 on the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III), diagnosed her with major depressive disorder, recurrent, mild, and opined that she related to others in a concrete manner, was able to articulate her basic needs,

---

[2]This consultative examination was purchased in relation to a prior claim, apparently as part of the agency's provisions for continuing disability review. The resulting report was incorporated as an addition to the current record upon motion by both parties (Docket Entry Nos. 25, 27), and upon its certification by the agency's records custodian, Mr. Earnest Baskerville (Docket Entry No. 27-1).

and would appear to have marked difficulty in managing her own funds (Tr. 679). Dr. O'Brien opined that plaintiff appeared to be significantly impaired in her ability to sustain concentration and persistence, adapt to changes in moderate to complex work environments, remember complex instructions, work effectively with others in the work force, and process information in an effective and efficient manner (Tr. 678).

From 1992-2004 plaintiff was treated by multiple providers for miscellaneous complaints including: abdominal pain, back pain, insect bites, urinary tract infection, cellulitis, miscellaneous congestion and nausea, arm pain, anxiety, chest pain and palpitations, injury from a motor vehicle accident, assault, rash, and the birth of four children followed by tubal ligation (Tr. 237-39, 251-300, 334-67, 399-468, 477, 492, 508, 515). During treatment plaintiff was alert and oriented with a normal mood/affect (Tr. 260, 262, 270, 286, 287, 300, 304, 310, 459, 582) and was able to understand discharge instructions (Tr. 253, 256, 262, 269, 271, 272, 284-85, 288-89, 291, 295-96).

While in jail pending her court hearing for writing bad checks and a probation violation, plaintiff underwent an emergency psychological assessment, on February 20, 2002 (Tr. 537-43). Plaintiff was not believed to be suicidal or overly depressed, but only trying to get out of court (Tr. 539). On exam, she was alert and oriented, had a flat and sad affect, anxious behavior, depressed mood, normal and organized thought flow, appropriate psychomotor function, fair to good memory and concentration with limited insight, judgment and impulse control (Tr. 540-41). Plaintiff was diagnosed with depressive disorder,

7

NOS and returned to jail (Tr. 541).

At Dr. Caten's referral, plaintiff underwent psychological evaluation for depression and panic attacks, on September 5, 2003 (Tr. 516-19, 529-36). Plaintiff reported a history of impulsive behavior and trouble controlling anger, excessive moodiness, restlessness and sleeping problems. On exam, was alert and oriented, her speech, thought content and flow were normal, her affect, behavior, insight, judgment and impulse control levels were appropriate, her mood depressed and her memory and concentration poor (Tr. 530-32). Diagnosed with major depressive disorder, recurrent, severe without psychotic features, panic disorder without agoraphobia, and a current Global Assessment Functioning ("GAF") score of 55,[3] plaintiff was also assessed with mild functional limitations with her activities of daily living, no limitations with interpersonal skills and moderate limitations with her ability to concentrate and adapt to change, and was identified as someone who was formerly severely impaired and needed services to prevent relapse (Tr. 516-18, 533-34). Two weeks later, plaintiff reported that her depression was related to the loss of custody of her four children and her recent incarceration (Tr. 524). On exam, she had the same findings and diagnosis (Tr. 525-27). The following month, plaintiff reported no significant episodes (Tr. 522-23). She had essentially normal findings on exam. Id. Plaintiff failed to show for

---

[3]GAF of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)* 32 (4th ed. 1994).

8

any further appointments (Tr. 520-21).

On May 7, 2003, at the request of the DDS, licensed psychological examiner Mary Kay Matthews performed a consultative psychological examination and IQ assessment (Tr. 205-09). The examiner reported that plaintiff was not a reliable source of information, that she skewed the information she provided in an attempt to maximize her problems, and that she was evasive, reluctantly gave information and minimally cooperated throughout the assessment (Tr. 205). She reported that she had a driver's license, had quit school after the 11th grade because she was pregnant, but never received mental health treatment and lost her disability when she went to jail for being an accessory to burglary (Tr. 206). The examiner noted that plaintiff was oriented, able to identify the correct date, and had just applied for food stamps, but that she responded "I don't know" or "I don't remember" to the examiner's questions and "attempted to present with memory and thinking problems;" she reported that she was "a very, very, very slow learner" despite being able to obtain a driver's license (Tr. 206-07). Ms. Matthews specifically reported that plaintiff's symptoms and behaviors were observed to meet the criteria for malingering[4] – she showed a lack of cooperation, was evasive throughout, and was unwilling initially to provide answers to certain questions. Her daily activities included watching television, sweeping the floor, minimal cooking and hanging out on the porch (Tr. 207). When administered the WAIS-III, plaintiff appeared to

---

[4]The willful, deliberate, and fraudulent feigning or exaggeration of the symptoms of illness or injury, done for the purpose of a consciously desired end. *Dorland's Illustrated Medical Dictionary (Dorland's)* 1091 (30th ed. 2003).

9

understand the instructions, but would then pause and give an incorrect answer (Tr. 208). The examiner estimated that plaintiff functioned in the borderline to low-average range of intelligence because she was able to obtain her driver's license; she opined that plaintiff was not significantly limited in any area and diagnosed her with malingering and a GAF score of 70[5] (Tr. 208-09). Ms. Matthews further opined that if plaintiff "could find the proper motivation to seek job or vocational training, it was possible she could function at a higher level" (Tr. 209).

Nine months later, Ms. Matthews performed a second consultative examination of plaintiff (Tr. 240-47). Plaintiff reported that she did not have any problems driving, that she had been in jail and had received mental health treatment three times (Tr. 241-42). The examiner again noted that plaintiff "wanted to present with impaired recent and remote memories," but it was not believed that she had any significant problems with either her recent or remote memory – her thinking and thought content were normal and her thought flow showed no evidence of loose association or flight of ideas (Tr. 242). The examiner reported that plaintiff "was evasive throughout the assessment" and that the examiner "watch[ed] her very closely during the IQ testing and [plaintiff] would look at the correct answers but then point out something else, her answer, "I don't know" (Tr. 243).

_____

[5]GAF of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *DSM-IV* 32 (4th ed. 1994).

10

Plaintiff reported the same activities (Tr. 241, 243-44). During psychological testing, the examiner noted that plaintiff did not have any difficulty understanding instructions and that her persistence and motivation were well below average (Tr. 244). The examiner opined that the administration of the WAIS-III was valid, but the IQ scores obtained by plaintiff were invalid and an underestimation of her true abilities due to her obvious malingering (Tr. 244-45). Ms. Matthews opined that plaintiff was not significantly limited in any area, and diagnosed her with malingering and a secondary diagnosis of Borderline Intellectual Functioning, noting that if awarded benefits, she could manage her own funds (Tr. 244-46). Again, Ms. Matthews opined that if plaintiff could find proper motivation to seek job or vocational training, it was possible that she might function at a higher level (Tr. 246-47). She opined that her diagnosis of malingering was consistent with plaintiff's observed behavior, her conflicting statements and the prior diagnosis on consultative examination in 2003 (Tr. 247).

On January 6, 2005, plaintiff was referred for psychological evaluation for depression (Tr. 555-60). During the evaluation, plaintiff reported that she talked to herself, heard her deceased granny's voice and had insomnia and mood instability (Tr. 556). Plaintiff was diagnosed with schizoaffective disorder, bipolar type, and substance abuse in remission, and found not capable of maintaining employment, managing her own funds or living alone; she was prescribed medication (Tr. 554-55, 558-59). During follow-up appointments, plaintiff reported that her sleep was much improved, that the medication was "working" and

11

"helping" and that her "nerves were better" (Tr. 550-53). On follow-up exams, plaintiff was alert and oriented with age appropriate insight, judgment and impulse control, appropriate behavior and limited concentration. Id.

On October 1, 2005, at the request of the ALJ, the medical evidence was reviewed by Dr. Francis Buda, who opined that the record was not clear whether plaintiff was mildly mentally retarded, depressed or had a schizoaffective disorder (Tr. 560). Dr. Buda noted that the limited school data indicated that plaintiff would score in the mild mental retardation range with higher achievement scores. Id. In order to resolve this conflict, Dr. Buda recommended that a psychiatrist perform a consultative examination and complete a functional assessment. Id.

Following Dr. Buda's recommendation, the ALJ referred plaintiff to Dr. James McFerrin for a consultative examination, which was conducted on February 5, 2006 (Tr. 561-65). Plaintiff arrived two hours early, was surly and uncooperative and reported that she had lived alone for several months since her husband's incarceration, had a valid driver's license, had received some psychiatric treatment and medication in 2005 until discharged for missing appointments, and had to pay child support and court fines (Tr. 561-63). Dr. McFerrin noted that plaintiff was able to live independently, talked on the phone, watched television and had friends, but was oppositional and resistant to providing information (Tr. 563). On exam, plaintiff was alert and oriented, could sign her name and the date correctly, could recall two of three objects at five minutes and the third with a slight hint, had normal

12

speech and, except for grammatical errors, communicated well though overall she was

somewhat tense and anxious (Tr. 563-64). Dr. McFerrin diagnosed plaintiff with depression

NOS with history of malingering by psychological tests, antisocial personality disorder,

borderline intelligence and a GAF of 65/70. Dr. McFerrin opined that plaintiff had antisocial

traits because of her legal history and not based on any psychological disorder, she appeared

sad and situationally depressed due to financial problems and social isolation, but that she

was able to live alone, manage by herself and was capable of managing benefits if awarded

(Tr. 565). Dr. McFerrin also completed a Medical Source Statement of Ability to do Work

Related Activities (Mental) and noted that plaintiff was slightly limited in her ability to

understand, remember and carry out short, simple instructions and interact appropriately

with supervisors and co-workers; moderately limited in her ability to make judgments on

simple work-related decisions, interact with the public, respond appropriately to work

pressures in a usual work setting and to changes in a routine work setting; and, that she was

markedly limited in her ability to understand, remember and carry out detailed instructions

(Tr. 566-67). To support his findings, Dr. McFerrin noted that plaintiff had borderline-to-

mild mental retardation/learning disability, very limited work history, avoidant and

antisocial behaviors with a history of incarceration, currently on probation (Tr. 566-68).

13

### III. Conclusions of Law

#### A. <u>Standard of Review</u>

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. <u>Elam ex rel. Golay v. Comm'r of Soc. Sec.</u>, 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Rogers v. Comm'r of Soc. Sec.</u>, 486 F.3d 234, 241 (6th Cir. 2007)(<u>quoting</u> <u>Cutlip v. Sec'y of Health & Human Servs.</u>, 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999).

#### B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." <u>Id.</u> at §

14

423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step

sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r

of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f),

416.920 (b)-(f).

        The SSA's burden at the fifth step of the evaluation process can be carried by

relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the

claimant is not significantly limited by a nonexertional impairment, and then only when the

claimant's characteristics identically match the characteristics of the applicable grid rule. See

Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be

used to direct a conclusion, but only as a guide to the disability determination. Id.; see also

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not

15

direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima*

*facie* case by coming forward with proof of the claimant's individual vocational qualifications

to perform specific jobs, which is typically obtained through vocational expert ("VE")

testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4

(S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

 In determining residual functional capacity ("RFC") for purposes of the

analysis required at steps four and five above, the SSA is required to consider the combined

effect of all the claimant's impairments, mental and physical, exertional and nonexertional,

severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483,

490 (6th Cir. 1988).

   C. Plaintiff's Statement of Errors

 Plaintiff alleges the following four errors in the ALJ's decision:  (1) that he

erroneously failed to consider the 2001 assessment of consultative examiner Dr. William

O'Brien, Psy.D.; (2) that he failed to fully develop the record when he declined to recontact

treating physician Dr. Caten, and when he failed to include in the record his correspondence

soliciting the expert opinion of Dr. Francis B. Buda, M.D., ABPN; (3) that he failed to

properly weigh Dr. Caten's opinion, as plaintiff's treating source, regarding her mental

capacities and limitations; and (4) that he failed to carry the government's burden of showing

other jobs which plaintiff is capable of performing, in that he relied on vocational expert

16

testimony that was given in response to a hypothetical question which inaccurately portrayed plaintiff's conditions and limitations.  As explained below, the undersigned finds that the record of plaintiff's mental impairment was not fully and fairly developed, and that the ALJ's decision at step three of the sequential evaluation process is not otherwise supported by substantial evidence; therefore, it is recommended that the matter be remanded for further administrative proceedings.

Addressing first the latter three arguments above, the undersigned finds no error in the ALJ's treatment of Dr. Caten's opinion or his development of the medical or vocational record.  Dr. Caten, a general practitioner and plaintiff's treating physician, offered an opinion as to her disability due to mental problems, stating in June 2004 that she was unable to work, had never worked, was in need of psychiatric care, and was "suspected to be a very slow person."  (Tr. 248)  Dr. Caten further opined that plaintiff was physically fine, but that her ability to understand, remember, concentrate, and adapt to change was "poor," while her ability to persist was "OK" and her ability to interact socially was "edgy."  (Tr. 214)  He did not believe that plaintiff was capable of managing her own funds, as she "tends to spend money" (Tr. 211).  In rejecting these opinions, the ALJ noted that Dr. Caten's treatment notes reveal that he had "occasionally prescribed mild anti-depressants for the claimant's complaints of depression ... [and] also treated her conservatively for various acute infections, sprains, and headaches."  (Tr. 22)  The ALJ then explained that "Dr. Caten's June 2004 conclusory statement of 'disability' due to the claimant's depression and being 'slow' is

17

unsupported by his own clinical records and conservative treatment of the claimant.

Additionally, said conclusory statement of disability necessarily requires a vocational analysis

that is reserved to the Commissioner." (Tr. 25) While plaintiff rightly points out the great

weight generally due a treating physician's medical opinion, Rogers v. Comm'r of Soc. Sec.,

486 F.3d 234, 242 (6th Cir. 2007), the June 2004 opinion of plaintiff's inability to work is not a

"medical opinion" under the regulations, but rather an opinion on an issue reserved to the

Commissioner, as pointed out by the ALJ. 20 C.F.R. § 416.927(e). Moreover, the medical

opinions which Dr. Caten did offer in support of plaintiff's disability application, related to

her "poor" or "edgy" abilities in several areas of work-related mental functioning as well as

her mental inability to manage funds, are simply unsupported by his treatment notes --

which reflect only occasional prescription of mild antidepressants and "suggestions" of the

need for a mental health referral (Tr. 213, 215) -- in addition to being outside his area of

expertise. The ALJ plainly gave good reasons for rejecting these opinions, consistent with

regulatory requirements. 20 C.F.R. § 416.927(d)(2).

Regarding the ALJ's duty to recontact Dr. Caten, alleged by plaintiff to have

been triggered by the inconsistency identified between Dr. Caten's opinions and his

treatment records, the government rightly notes that the duty to recontact a treating source

arises only when the treating source's opinion is "inadequate" to allow the disability

determination to proceed. 20 C.F.R. § 416.912(e). In other words, the duty to recontact a

treating source for clarification of his opinion arises only when the record as a whole fails to

disclose the basis for that opinion, such that the treating source opinion is the proverbial "loose end" preventing a full resolution of the case. See 20 C.F.R. § 416.927(c); Soc. Sec. Rul. 96-5p, 1996 WL 374183, at *6 (S.S.A. Jul. 2, 1996). No such scenario was presented on the record in this case, where plaintiff's mental functioning was assessed by more qualified professionals in treatment of plaintiff's emotional impairments, as well as in the consultative evaluation of plaintiff's impairments for purposes of disability benefits. The ALJ thus did not err in failing to recontact Dr. Caten.

As to the ALJ's failure to include in the record copies of his correspondence to Dr. Buda, apparently in violation of the SSA's internal procedural requirements contained in its Hearing, Appeals and Litigation Manual, the undersigned finds any resulting error to be harmless, inasmuch as Dr. Buda offered no substantive opinion on the matter of plaintiff's level of impairment, but merely recommended obtaining a consultative psychiatric evaluation and any updated records of plaintiff's mental health treatment in order to resolve the issues pertaining to plaintiff's mental functioning.

Regarding the hypothetical question posed to the vocational expert at plaintiff's supplemental hearing, it is argued that the ALJ did not accurately portray plaintiff's mental impairments as they were assessed by the consulting psychiatrist, Dr. McFerrin, one of the consultants upon whom the ALJ relied in determining plaintiff's mental residual functional capacity. Specifically, plaintiff argues that the ALJ erroneously failed to recite to the expert that plaintiff had been found by Dr. McFerrin to display "[b]orderline to

19

mild mental retardation/learning disability" (Tr. 566) and "avoidant," "oppositional and resistant," and "antisocial" traits (Tr. 563, 567). Seizing upon the above mention of mild mental retardation, plaintiff argues that the vocational expert would not have testified to a significant number of available jobs if he had been presented with a hypothetical including this diagnosis. However, Dr. McFerrin gave an Axis II diagnosis of "Borderline intelligence," not mild mental retardation. (Tr. 565) The fact that he felt plaintiff's functioning to be on the lower end of the borderline range, rather than the higher end of that range, does not necessarily undermine his diagnosis. More importantly for purposes of plaintiff's argument, Dr. McFerrin's opinions as to the functional limitations attributable to plaintiff's intellectual and behavioral traits included moderate limitations in the ability to make judgments on simple work-related decisions, the ability to interact appropriately with the public, and the ability to respond appropriately to changes or pressures in the routine work setting; her ability to interact appropriately with supervisors and co-workers, and to understand, remember and execute short, simple instructions was noted to be only slightly limited. (Tr. 566-67) These limitations were fairly encompassed by the ALJ's hypothetical including limitations "to work that would involve no more than simple, repetitive, non-detailed tasks, where coworker and public contact would be no more than casual and infrequent[,] [s]upervision would be direct and non-confrontational[, and] [c]hanges in the workplace would be infrequent and gradually introduced" (Tr. 667). See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008) (citing, e.g., Smith v. Halter, 307 F.3d 377, 379 (6th Cir.

20

2001)); cf. Potter v. Comm'r of Soc. Sec., 2007 WL 1339840 (6th Cir. May 8, 2007). Even if

such limitations were not fairly encompassed by the ALJ's hypothetical, plaintiff's counsel

presented the limitations as assessed by Dr. McFerrin on cross-examination, and the expert

testified that they would not affect the jobs identified. (Tr. 670-71)

Turning to the crux of this case, encompassed by plaintiff's allegations relating

to Dr. O'Brien's assessment, the issue is whether the record substantially supports the ALJ's

finding of plaintiff's borderline intellectual functioning (Tr. 21), versus mild mental

retardation. The latter is an impairment that may be presumptively disabling under the

regulations, while the former is not. In order to establish medical disability due to mental

retardation, the following diagnostic criteria and test results (as relevant here) must be

established in the record:

> [S]ignificantly subaverage general intellectual functioning with deficits in
> adaptive functioning initially manifested during the developmental period;
> i.e., the evidence demonstrates or supports onset of the impairment before age
> 22.
>
> The required level of severity for this disorder is met when the requirements
> in A, B, C, or D are satisfied.
>
> ...
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a

physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

The 2001 consultative report of Dr. O'Brien, which is undoubtedly favorable to plaintiff's claim to disability under Listing 12.05(B), has been the source of some confusion in this case, as noted by the undersigned in a prior order:

> The undersigned is frankly confused over the status of this consultative examiner's 2001 report, vis-à-vis the administrative record on plaintiff's current, 2003 application.  Plaintiff's counsel secured the report's addition to the record as an aid to judicial review, noting his belief that it had been generated as part of an earlier, continuing disability review proceeding but had also been submitted as an exhibit before the ALJ in proceedings on plaintiff's current application, consistent with his own citation to the report in a pre-hearing brief submitted to the ALJ (Docket Entry No. 25; see Docket Entry No. 14 at 178).  Subsequently, defendant moved this same report's admission as a supplement to the administrative record "because there were six pages (Nos. 675 through 680) that had been inadvertently omitted in the transcript initially filed with the Court."  (Docket Entry No. 28)  The copy of the 2001 report submitted by defendant is numbered sequentially with the record transcript, which had ended with page 674 in its original presentation (Docket Entry No. 14).  Despite defendant's representation that this report had been

22

inadvertently omitted from the transcript earlier filed, the transcript through page 674 contains all of the exhibits (including all 18 medical evidence exhibits) that were admitted into evidence by the ALJ at the hearing. <u>Cf.</u> Docket Entry No. 14 at 3-4A <u>with</u> Docket Entry No. 14 at 661. Given this description of the record made before the ALJ, in addition to the fact that the 2001 consultative examiner report was not mentioned at either the original or supplemental hearing before the ALJ, nor in the ALJ's decision, the undersigned would be hard pressed to accept that the 2001 report was in fact a part of the record before the ALJ when he wrote the decision subject to review here.

(Docket Entry No. 30 n.1) The undersigned remains skeptical of plaintiff's argument that the ALJ simply disregarded this report, or implicitly rejected it because of its inconsistency with more recent reports on consultative examination. Rather, it appears doubtful at best that the 2001 report was incorporated into the record considered by the ALJ; the record is similarly devoid of any other agency paperwork pertaining to continuing disability review, though a Field Office Disability Report related to plaintiff's March 6, 2003 application contains a handwritten note that plaintiff had made a prior filing, and that the "prior file [was] ordered 3/18/03."[6]

It remains plaintiff's burden to submit proof of her alleged disability. <u>Jones v. Comm'r of Soc. Sec.</u>, 336 F.3d 469, 474 (6th Cir. 2003). However, on this record as detailed below, the failure of the ALJ to assimilate the evidence associated with plaintiff's repeatedly referenced prior disability award amounts to reversible error, in that the current record was not fully and fairly developed, and review for substantial evidence is therefore thwarted.

*__Plaintiff's Prior Applications__*. Despite the lack of any record evidence of the

---

[6]Counsel's pre-hearing brief states that, "[a]s the Claimant's prior claims file was apparently lost by the SSA it appears Dr. O'Brien's conclusions are based upon psychiatric documentation lost or misplaced by the SSA and not available for consideration in this proceeding." (Tr. 178)

continuing disability review process, there are multiple references in the record to the fact

that plaintiff was receiving supplemental security income benefits prior to beginning a

period of incarceration that lasted for more than a year,[7] and that apparently ended in

January 2003. (Tr. 83, 145, 178, 206, 242, 563, 565)  The hearing transcript reveals that

plaintiff's counsel informed the ALJ that plaintiff had a prior award of benefits as a child (Tr.

643), which the ALJ dismissed as irrelevant to proceedings on the current application (Tr.

644).  Dr. Caten's notes from February 24, 1993, when plaintiff was 16 years old, reflect his

submission of disability papers on plaintiff's behalf (Tr. 225); correspondingly, in her

applications for benefits filed after being released from custody, plaintiff had alleged the

onset of disability as of February 1, 1993.  (Tr. 19)  However, as detailed in counsel's pre-

hearing brief to the ALJ, Dr. O'Brien recorded his findings and test results upon consultative

examination of plaintiff on October 11, 2001, when plaintiff was 24 years old.  (Tr. 178)  The

record thus suggests that plaintiff's award of childhood benefits continued into adulthood,

subject to the regulatory provision for continuing disability review and the eligibility

---

[7]Title XVI of the Social Security Act excludes from eligibility for SSI benefits "anyone who is
an 'inmate in a public institution.'"  Schweiker v. Wilson, 450 U.S. 221, 224 (1981) (quoting 42 U.S.C.
§ 1382(e)(1)(A)).  An individual incarcerated in jail or prison is considered an "inmate in a public
institution."  Id. at 232.  The agency  has promulgated regulations implementing this exclusion from
SSI eligibility, including provisions for the suspension of such benefits effective the first full month of
incarceration, and resumption of benefit payments effective from the earliest day of the month in
which the "recipient is no longer a resident of a public institution."  20 C.F.R. § 416.1325.  However,
the regulations also provide for the termination of SSI benefits "following 12 consecutive  months of
benefit suspension for any reason ... effective with the start of the 13th month after the suspension
began."  20 C.F.R. § 1335.  Thus, while termination of benefits previously awarded typically requires
a finding of the recipient's medical improvement, "when an individual is incarcerated for a period of
more than twelve months, her SSI benefits will be terminated regardless of the presence or absence of
medical improvement in her impairment(s)."  Brennan v. Astrue, 501 F.Supp.2d 1303, 1309 (D. Kan.
2007).

Case 2:08-cv-00095   Document 44   Filed 02/24/10   Page 24 of 36 PageID #: 192

requirements/exclusions prescribed by statute. Courts have held that the failure of an ALJ to acquire the documents evidencing such a prior award of benefits can amount to a failure, in the current case, to fulfill the duty of developing a full and fair record, based on the regulation requiring development of the claimant's "compete medical history" for at least the twelve months preceding the filing of her application "unless there is a reason to believe that development of an earlier period is necessary," 20 C.F.R § 416.912(d). See Tominus v. Astrue, 2009 WL 35164, at *2-3 (M.D. Fla. Jan. 6, 2009); Brennan v. Astrue, 501 F.Supp.2d 1303 (D.Kan. 2007). While the government argues that any such error in this case is harmless, based on the strength of the other evidence supporting the finding of nondisability, the undersigned is not convinced.

   The ALJ in this case referred to only one prior application in his decision: on March 6, 2003, plaintiff filed an SSI application (Tr. 90-93), in response to which the state DDS obtained seven pages of plaintiff's high school records (Tr. 197-204),[8] and secured the services of consultative psychological examiner Mary Kay Matthews, who examined plaintiff on May 7, 2003 (Tr. 205-09). In accord with Ms. Matthews's negative review of plaintiff's allegations of mental disability, plaintiff's application for benefits was denied on May 27, 2003, at the initial level of agency review (Tr. 77-79), and plaintiff did not appeal from that denial. Rather, some six months later she filed a new application (Tr. 82-86), which was given a protective filing date of November 26, 2003 (Tr. 88). In her new application, plaintiff

---

   [8]These records included documentation certifying plaintiff's placement in special education; one psychological evaluation by the school psychologist when plaintiff was sixteen years old; and the final Individualized Education Program plan documents reflecting plaintiff's decision to quit school prior to the 1994-95 school year.

alleged the same date of disability onset -- February 1, 1993 -- that she had alleged in her prior application, and therefore the ALJ construed the new application to impliedly request reopening of the prior application. (Tr. 19) The ALJ denied this request.

In reviewing the evidence which preceded the filing of plaintiff's current application, the ALJ noted Ms. Matthews's May 2003 finding that plaintiff's intellectual functioning could not be properly measured because of her lack of motivation and inability to persevere on any of the subtests. Ms. Matthews diagnosed plaintiff as a malingerer, estimating that despite her presentation she actually functioned "in the borderline to low average range of intelligence, because she was able to get her driver's license." (Tr. 208) However, it is noteworthy that Ms. Matthews had only her interview and examination of plaintiff to draw from in forming these opinions, as she was not provided with plaintiff's school records. Ms. Matthews plainly disbelieved all of plaintiff's allegations, concluding her report by giving the following prognosis: "If the claimant could find the proper motivation to seek job or vocational training, it is possible that she might function at a higher level. However, Susan does not want to work and only wants to receive disability benefits." (Tr. 209) Ms. Matthews opined that plaintiff would not be capable of managing such benefits, if awarded. (Tr. 208)

*The Current Application*. Upon the filing of plaintiff's current application, DDS again referred plaintiff for a consultative psychological examination. The referral once again went to Ms. Matthews, who on February 2, 2004, conducted her second evaluation of plaintiff in a nine-month period. (Tr. 240-47) This time, Ms. Matthews was able to administer tests of plaintiff's intelligence and academic achievement, revealing scores

26

consistent with functioning at the level of mild mental retardation. However, Ms. Matthews felt that these scores were invalid due to plaintiff's "obvious malingering." (Tr. 245) She again diagnosed malingering and borderline intellectual functioning (Tr. 246), and this time opined that plaintiff would be capable of managing any benefits awarded (Tr. 244). Once again, Ms. Matthews was not provided with any historical records to review prior to examining plaintiff, save for a copy of her own assessment of plaintiff some nine months earlier. (Tr. 240)

Following this second examination by Ms. Matthews, plaintiff hired counsel to assist her. (Tr. 63-65) Counsel was able to obtain a more complete set of school records, including the final psychological evaluation done when plaintiff was sixteen years old (which had previously been discovered by DDS), but also including previous such evaluations when plaintiff was twelve and nine years old, respectively. (Tr. 494-507) These two prior evaluations reported plaintiff's scores in the range of mild mental retardation on intelligence and achievement testing, which scores the later evaluation cited as the reason to forego further intelligence testing, due to the expectation that the results of any such testing would be consistent with the results in the mild retardation range already (twice) achieved. None of the school psychologist's reports stated that plaintiff was less than fully cooperative with the testing process.

All three school psychological evaluations included tests of plaintiff's adaptive functioning. All three utilized the Vineland Adaptive Behavior Scales - Interview Edition, wherein plaintiff's mother was interviewed regarding plaintiff's social, communicative, and daily living skills as displayed in the home. Plaintiff's adaptive functioning as measured by

27

this instrument was adequate in all domains, on each administration of the interview.  (Tr. 496, 501, 506)  The classroom edition of the Vineland Adaptive Behavior Scales was also utilized as part of plaintiff's first two psychological evaluations, when she was nine and twelve years old, respectively, and the information provided by plaintiff's teacher on both occasions yielded a composite score which reflected adequate adaptive functioning.  Id. However, as part of the psychological evaluation when plaintiff was sixteen years old, the classroom edition of the Vineland instrument was not utilized, but rather the "AAMD Adaptive Behavior Scale - School Edition" was utilized, resulting in scores across nine domains, two of which ("economic activity" and "self-direction") revealed deficits of adaptive functioning.  (Tr. 497)  Nonetheless, it was concluded that plaintiff's "adaptives appear to be reflective of adequate functioning in almost all areas within the home and school environments."  Id.

In order to reconcile the consistently low IQ scores obtained during plaintiff's childhood and recognized as valid by her school psychologists, with the similar scores obtained by Ms. Matthews but which she recognized as invalid, the ALJ ultimately procured the assessment of Dr. McFerrin, who reviewed plaintiff's file, including her school records, and consultatively examined plaintiff on February 3, 2006.  (Tr. 561-68)  Dr. McFerrin observed that plaintiff was generally surly or uncooperative during the interview.  She related attempts to work in the past, but no sustained employment.  She lived alone in a trailer on the property of her father-in-law at the time, while her husband was incarcerated. She reported that she did none of the cooking or cleaning, but that her mother and a male friend took care of those chores.  Dr. McFerrin diagnosed plaintiff with depression, a "history

28

of malingering by psychological tests," antisocial personality disorder, and borderline
intelligence. (Tr. 564-65) He concluded his report with the following assessment:

> This young woman is able to live alone and manage by herself. She states she
> has assistance from her mother and her male friend with some other needs
> such as cooking and cleaning. However, she makes no effort at any of these.
> Her attempts at work have been fleeting as have her other responsibilities.
> She has lost custody of her four children. The claimant has documented
> learning disabilities and was certified while in school but found to have
> adequate social skills to manage independently. The claimant is currently
> [married,] although her husband is in jail. She is provided with the place to
> live and support through various family members. She states she lost her SSI
> check when she was [in] jail for aggravated burglary and writing bad checks.
> The claimant is considered to have antisocial traits because of her legal history
> and not based on any psychological disorder. She does appear sad and
> situationally depressed because of her financial problems and social isolation.
> The claimant is capable for disability purposes to manage benefits if awarded
> or continued.

(Tr. 565) Dr. McFerrin did not administer an IQ test during his examination of plaintiff, but
noted that "[r]eview again of her prior treatment and her performance indicates that the
claimant functions in the mild mental retardation area with borderline intellectual
functioning and malingering." (Tr. 561)

       *The ALJ's Decision.* In considering the record of plaintiff's intellectual
impairment at steps two and three of the sequential evaluation process, the ALJ discounted
plaintiff's low IQ scores as a child by stating that they were thought by her school
psychologist to be due to "educational deficits" rather than any "organic cognitive problems."
(Tr. 21, 23) The undersigned finds no mention of this distinction in any of the reports from
plaintiff's school records. Quite the contrary, this case is fairly atypical of Listing 12.05 cases,
in that it very clearly establishes plaintiff's "significantly subaverage general intellectual

29

functioning ... initially manifested during the developmental period" -- plaintiff's intelligence was formally tested twice during the developmental period, yielding valid scores in the retardation range and resulting in the psychologist's certification of plaintiff's "[s]ignificantly impaired intellectual functioning which is more than two standard deviations below the mean." (Tr. 501, 506) In 1989, when plaintiff was twelve years old, intelligence testing revealed that her "[v]erbal reasoning, vocabulary, general fund of information and sequencing abilities measured as severely impaired." (Tr. 501) These intellectual deficiencies are distinct from her similarly deficient academic achievement, which was particularly impacted by the mild retardation of her visual-motor skills and a "severely deficient" ability to perform math. (Tr. 496, 501, 506) Although the ALJ faulted these measures for not containing "validity profiles to assess malingering" (Tr. 21, 23), it is unclear what exactly a child who was first referred for psychological evaluation at the age of nine because of "extreme academic difficulty" (Tr. 504) would stand to gain by exaggerating her degree of impairment.

Nonetheless, the ALJ correctly observed that plaintiff's placement in special education was due to unspecified "functional delay" rather than mental retardation, despite her measured intellectual ability, because of her adequate level of general adaptive functioning. The diagnostic definition of retardation under Listing 12.05 requires that the claimant's significant intellectual deficits be accompanied by deficits of adaptive functioning, both at present and within the developmental period. See Foster v. Halter, 279 F.3d 348, 354-55 (6th Cir. 2001). The Sixth Circuit has recently expounded on this requirement of adaptive deficits, as follows:

30

The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills.  <u>Heller v. Doe</u>, 509 U.S. 312, 329 (1993) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 28-29 (3d rev. ed. 1987) ("DSM-III")).  To determine the definition of mental retardation under the SSA, it is appropriate to consult leading professional organizations' definitions.  <u>See</u> 67 Fed.Reg. 20022 (2002).  The American Psychiatric Association defines adaptive-skills limitations as "[c]oncurrent deficits or impairments ... in at least two of the following areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety."  DSM-IV-TR at 49.

<u>Hayes v. Comm'r of Soc. Sec.</u>, 2009 WL 4906909, at *5 (6th Cir. Dec. 18, 2009).  <u>See also</u> <u>Durden v. Astrue</u>, 586 F.Supp.2d 828, 833-34 (S.D. Tex. 2008).

As previously noted, plaintiff's final psychological evaluation within the school system measured her adaptive functioning by reference to nine domains, and reported scores indicative of adequate functioning except in the areas of "economic activity" and "self-direction," where functional deficits were indicated.  (Tr. 497)  The test utilized in this measurement of adaptive functioning was tailored to the school environment, and its domains do not track the language of the DSM-IV-TR, quoted above.  However, it would appear that the deficits indicated on that test are at least arguably sufficient to demonstrate the onset of adaptive deficits, concurrent with the intellectual deficits noted, during plaintiff's developmental period.  Furthermore, it has been held that an award of childhood benefits based on mental retardation may itself be deemed evidence of impairment onset during the developmental period.  <u>Velardo v. Astrue</u>, 2009 WL 229777, at *7 (W.D. Pa. Jan. 29, 2009).

With regard to plaintiff's current adaptive functioning, the ALJ found no

31

significant deficits based on his observation that, in the realm of daily living skills, she "is still capable of taking care of her personal hygiene needs, driving, preparing simple meals, and performing light household chores," and that, in the realm of social functioning and communication skills, she "visits her family occasionally" and "is apparently able to function in an appropriate manner in the public domain in such places as doctor's offices, grocery stores, and other facilities." (Tr. 23)  However, the reports in the record documenting plaintiff's daily activities are not impressive for anything other than minimal self-care -- while she maintains an acceptable level of personal hygiene, it appears that plaintiff only prepares herself simple, cold meals and does not perform much in the way of household maintenance; rather, most of the cooking, cleaning, and shopping appears to be primarily done by her mother, her husband, or others in her household.  (Tr. 116-26, 147-54, 172-75, 207, 243-44)  As to plaintiff's social functioning, there is ample evidence of plaintiff's "assaultive," impulsive, "edgy," isolating, or otherwise antisocial behavior (Tr. 168, 214, 530, 564, 565, 650-51, 665-67), and the ALJ himself found plaintiff's severe impairments to include antisocial personality disorder (Tr. 21).[9]  From this evidence, and further considering the DSM-IV-TR criteria for adaptive deficits in the areas of, inter alia, "self-direction," "functional academic skills," and "work,"[10] the undersigned cannot find

---

[9]Although Dr. McFerrin noted that he considered plaintiff to have antisocial traits "because of her legal history and not based on any psychological disorder," he included antisocial personality disorder among his diagnoses and assessed work-related limitations based on such traits (Tr. 565, 567), and the record generally supports the existence of such a disorder as a severe impairment.

[10]The record demonstrates that plaintiff has been unable to maintain employment for any significant length of time (Tr. 80-81), such that she was determined to have not engaged in substantial gainful activity at any time since February 1993 (Tr. 21) and to have performed no past relevant work (Tr. 25).

32

substantial evidentiary support for the ALJ's finding of no current deficits of adaptive functioning.

Finally, the government contends that plaintiff has never been diagnosed with mental retardation, and that disability under Listing 12.05 cannot be established in the absence of a formal diagnosis, citing Foster v. Halter, 279 F.3d at 354-55.  However, other courts presented with this same argument have declined to read Foster as imposing such a requirement, and have instead found that nothing in the plain language of the regulation requires a formal diagnosis of mental retardation, but that, consistent with Foster, only the medical *findings* required in the diagnostic description of the disorder and in the subparagraphs pertaining to severity of the condition are required to establish disability. King v. Barnhart, 2007 WL 968746, at *5 (S.D. Ind. Feb. 26, 2007); see Parent v. Comm'r of Soc. Sec., 2008 WL 1795019, at *8 (E.D. Mich. Apr. 18, 2008).  See also Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006); Velardo, supra at *13; Witt v. Barnhart, 446 F.Supp.2d 886, 894-95 (N.D. Ill. 2006).  The undersigned concurs with these authorities, consistent with the Sixth Circuit's opinion in Foster, that a claimant who demonstrates the listed diagnostic and other criteria is entitled to benefits regardless of whether a formal diagnosis of mental retardation has been made on the record.  While the record under consideration here does not appear to include any such formal diagnosis by an "acceptable medical source," it is at least noteworthy that the treating mental health nurse practitioner, April Rumage, APRN, BC, has given the diagnosis of mental retardation, degree unspecified.  (Tr. 554, 558)

In sum, it is clear that plaintiff's cause is not helped by the fact that she has

33

run afoul of the law on more than one occasion, has been diagnosed as a malingerer by Ms. Matthews, and has been surly and uncooperative with both Ms. Matthews and Dr. McFerrin. However, the record in this case reveals a claimant with lifelong mental problems, who was in special education from the third grade on due to her intellectual impairment; whose reportedly valid verbal, performance, and full scale IQ scores consistently measured in the range of mental retardation during her developmental period; whose adaptive functioning was generally adequate during her school years, but was also noted to be deficient in certain particulars at the time of the latest inquiry; who was unable to maintain custody of any of her four children; who has never performed substantial gainful activity; and, who evidently was awarded and received SSI benefits from an early age due to her mental impairment, until her entitlement to those benefits was terminated following her imprisonment for a term of more than one year. While the ALJ appreciated the need to resolve the inconsistency between the records of plaintiff's school-age testing, which yielded valid IQ scores in the retardation range, and the report of Ms. Matthews, which yielded similar IQ scores that were deemed invalid, the consultative report solicited from Dr. McFerrin is heavily reliant on Ms. Matthews' reports and diagnoses, and was rendered without the benefit of any independent testing. It is true that, without considering the 2001 report of Dr. O'Brien, there are no valid IQ scores of record which are current for purposes of plaintiff's most recent SSI application. However, the record shows that plaintiff has never scored above 70 on any administration of a Wechsler-series IQ test, in any of the reported verbal, performance, or full scale domains.

Considering that the record suggests a prior award to plaintiff of SSI benefits due to her intellectual impairment, which purportedly spawned Dr. O'Brien's assessment for

34

purposes of continuing disability review, the undersigned finds that the ALJ's determination of plaintiff's current borderline intellectual functioning without reference to these earlier findings and proceedings cannot stand. The extent to which evidence supporting an agency decision amounts to 'substantial evidence on the record as a whole' cannot be determined without "tak[ing] into account whatever in the record fairly detracts from its weight." Tyra v. Sec'y of Health & Human Servs., 896 F.2d 1024, 1028 (6th Cir. 1990). Here, in order that a proper such account may be taken, the undersigned would recommend remand for purposes of developing the record of prior awards and proceedings related to plaintiff's mental functioning, and any further evidentiary development that the ALJ may deem necessary.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge hereby recommends that plaintiff's motion for judgment be GRANTED, that defendant's motion for judgment be DENIED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this report.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 24th day of February, 2010.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

36